UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JANE DOE, | : | |
| [Address Redacted] | : | |
| | : | Case: 1:17−cv−00333      **JURY DEMAND** |
| *Plaintiff,* | : | Assigned To : Boasberg, James E. |
| | : | Assign. Date : 2/24/2017 |
| vs. | : | Description: Other Civil Rights      **(L-DECK)** |
| | : | |
| | : | Jury Trial Demanded |
| GEORGE WASHINGTON UNIVERSITY | : | |
| 2100 Pennsylvania Avenue, NW | : | |
| Washington, DC 20052 | : | |
| | : | |
| Serve: Mary Lynn Reed | : | |
| Registered Agent for the | : | |
| Service of Process | : | |
| | : | |
| RASHALL BRACKNEY | : | |
| 2100 Pennsylvania Avenue, NW | : | |
| Washington, DC 20052 | : | |
| Individually, and in her | : | |
| official capacity as | : | |
| Chief of Police | : | |
| for Defendant GW University | : | |
| | : | |
| *Defendants.* | : | |

====================================

## COMPLAINT

### The Nature of this Action

1.      This is an action against defendant George Washington University and its

Chief of Campus Police (hereinafter collectively "Defendants" "GWU" or "the

University") for declaratory and injunctive relief and monetary damages.

2.      This Complaint seeks to redress harm that plaintiff, Jane Doe ("Plaintiff or

"Ms. Doe"), a GWU graduate student, suffered as a result of a University disciplinary

1

action which resulted in Ms. Doe's termination from the University, and barred from the GWU neighborhood, in violation of Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"), 42 U.S.C. § 1983, *et. seq.* ("Section 1983"), the District of Columbia Human Rights Act, D.C. Code §§ 2-1401 *et seq.* ("D.C. Human Rights Act"), and common law claims for breach of contract, promissory estoppel and negligence – all of which occurred without notice and an opportunity to be heard, and which were motivated by discrimination based on gender.

**II. Parties**

3.      Plaintiff Jane Doe is a District of Columbia resident and a former student at the George Washington University's Elliott School of International affairs (hereinafter "Elliott").

4.      Ms. Doe files herewith a motion for leave to use pseudonyms for herself and "John Doe."

5.      "John Doe" is a pseudonym for the male GWU student alleged to have abused plaintiff and who received disparate treatment by the University.

6.      Upon information and belief, George Washington University ("GWU") is a non-profit corporation organized under law as a private university in the District of Columbia.

7.      Defendant RaShall Brackney is the Chief of Campus Police at George Washington University in the District of Columbia. The state of Chief Brackney's domicile is unknown. Chief Brackney is named individually and in her official capacity as Chief of University Police.

**III.     Jurisdictional Averments**

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. §

1331 because this case raises federal questions under the Fourth and Fifth Amendment

of the United States Constitution, 42 U.S.C. § 1981, and Title IX of the Education Act

Amendments of 1972, 20 U.S.C. § 1681.

9.      This Court has supplemental jurisdiction over Plaintiff's state law claims

pursuant to 28 U.S.C. § 1367.

10.     Venue is appropriate because the alleged unlawful actions were

committed within the District of Columbia.

**IV.     Facts Common to All Counts**

11.     On or about November 13, 2015, George Washington University's Elliott

School of International Affairs invited plaintiff, Jane Doe, then a prospective student, to

attend a University-sponsored, on-campus event, where she met John Doe, another

prospective Elliott student.

12.     On March 11, 2016, Ms. Doe became an admitted student in Elliott's

Master of Arts in Security Policy Studies program for the fall 2016 semester.

13.     Ms. Doe paid a non-refundable tuition deposit by check, which was

cashed by the University, and Ms. Doe assigned a student ID number. Ms. Doe was

provided with instructions on how to access the University's internet portal.

14.     At approximately the same time, John Doe was admitted into the Masters of International Affairs at Elliott. Upon information, Mr. Doe followed the same admissions procedure used by Ms. Doe.

15.     At all times relevant, Ms. Doe and Mr. Doe were in identical relationships with the University, and were indistinguishable, in regards to the legal issues relevant to this complaint, except for gender.

16.     On April 8, 2016, at a second University-sponsored, on-campus event at Elliott, after both Mr. & Ms. Doe were admitted students, the Does were involved in an unfortunate confrontation.

17.     A witness told the campus police, who were summoned, that Mr. and Ms. Doe had been "involved in an incident and had to be separated."

18.     Between the two Elliott School events of November 13, 2015 and April 8, 2016, Mr. and Mrs. Doe were involved in a romantic relationship, which Mr. Doe encouraged.

19.     However, the relationship between Mr. and Ms. Doe grew acrimonious, because, according to Ms. Doe's Title IX Complaint with the University, Mr. Doe became abusive.

20.     When the campus police arrived on April 8, 2016, they found Ms. Doe with physical injuries (as depicted in police photographs), while Mr. Doe had a large coffee stain on his shirt, but was otherwise fine and smiling.

21.     Initially, the campus police handcuffed both Mr. Doe and Ms. Doe and took both into custody.

22.     Upon information, Mr. Doe told the campus police that Ms. Doe had spilled coffee on him intentionally. Ms. Doe showed the campus police her physical injuries.

23.     Later, in a sworn declaration, Mr. Doe retracted his claim, affirming under oath that Ms. Doe did not spill the coffee on him intentionally. (See, Mr. Doe's affidavit, exhibit 1).

24.     An independent student witness to the April 8th confrontation has been interviewed and will testify that the two male campus police officers who arrived were immediately and needlessly hostile toward Ms. Doe, and used surprisingly aggressive tactics towards her, under the circumstances presented.

25.     Mr. Doe was able to convince the male police officers to release him from custody, falsely placing the entire blame on Ms. Doe. Mr. Doe depicted Ms. Doe as a scorned woman out for revenge, a false narrative Mr. Doe has since retracted.

26.     The two male police officers decided to arrest Ms. Doe, while Mr. Doe was released and told he was allowed to return to the Elliott reception. Mr. Doe was released from handcuffs, while Ms. Doe was carted away to jail.

27.     Plaintiff avers that testimony from qualified experts will establish that it is police practice in the District of Columbia, and the national standard of care, to arrest a male suspect for assault, when a female shows any visible sign of injury, as did Ms. Doe, and this standard of care is designed to prevent what happened in this case – male cops siding with a male perpetrator and hauling the woman off to jail, an archaic, discriminatory practice which has no place in society today.

28.     On April 8, 2016, at an on-campus GW reception, Mr. and Mrs. Doe received substantially disparate treatment by the University based on gender.

29.     If anyone should have been arrested on April 8th, 2016 it was Mr. Doe, because Ms. Doe showed injuries consistent with physical abuse.

30.     At all times relevant, the George Washington University campus police officers were acting under color of law, within the scope of their employment, in the furtherance of University business.

31.     George Washington University campus police have the same, full police powers as regular District of Columbia police officers, and were exercising those police powers when they seized and arrested plaintiff on April 8, 2016, and later barred her from the neighborhood.

32.     Ms. Doe's arrest was illegal. There was neither probable cause to believe that Ms. Doe committed a felony, nor a misdemeanor in the officers' presence.

33.     Ms. Doe was subject to custodial interrogation by the campus police, in violation of her Fourth, Fifth and Sixth Amendment rights.

34.     From Elliott, Ms. Doe was placed in a holding cell while the police presented their evidence to the U.S. Attorney's Office.

35.     The U.S. Attorney's Office promptly no-papered Ms. Doe's case. Upon information and belief, the reason the U.S. Attorney no-papered the case was because it was meritless. The basis of this information and belief is a review of the police report, interviews with witnesses, and a finding by Superior Court Judge Diane Lepley that Ms. Doe was actually innocent of the charges for which she was arrested.

36.     Upon information, after Mr. Doe saw Ms. Doe being taken into custody, he had second thoughts about what he had done, and contacted the authorities in hopes that they would release Ms. Doe, to no avail.

37.     Ms. Doe never assaulted Mr. Doe.

38.     Ms. Doe is factually innocent of the charge of assault.

39.     Mr. Doe will testify that Ms. Doe never assaulted him, and that she is factually innocent of the charges of assault. (*See,* Mr. Doe's sworn declaration, exhibit 1)

40.     Ms. Doe never posed any threat to Mr. Doe at any time.

41.     Mr. Doe will testify that Ms. Doe never posed any threat to Mr. Doe at any time. (Mr. Doe's sworn declaration, exhibit 1)

42.     On December 12, 2016, the Honorable Diane S. Lepley found pursuant to D.C. Code 16—802(c) that Ms. Doe did not assault Mr. Doe and ordered that the records of Ms. Doe's arrest be sealed on the grounds of "actual innocence," and entered judgment accordingly in the District of Columbia Superior Court.

43.     Mr. Doe and Ms. Doe have not had contact since the April 8, 2016 incident.

44.     On April 9, 2016, the day after the confrontation, the University emailed Ms. Doe a log-in ID and instructions with how to access "GWeb Informations Systems," where Ms. Doe was instructed to select her fall classes and access her student financial account.

45.    On April 11, 2016, three days after the confrontation, Ms. Doe personally met with Nicole Campbell ("Dean Campbell"), Director of Graduate Admissions at Elliott at Dean Campbell's office.

46.    Dean Campbell, who was present for the April 8th incident, told Ms. Doe at their April 11, 2016 meeting that the incident would not affect her student status, and told Ms. Doe to "lookout for enrollment and registration instructions coming in May."

47.    The April 11, 2016 meeting between Dean Campbell and Ms. Doe was at all times cordial and professional.

48.    In her meeting with Ms. Doe on April 11, 2016, Dean Campbell never mention anything about a barring notice, or suggested in any way that Ms. Doe should not be meeting in Dean Campbell's office.

49.    Upon information and belief, Dean Campbell, who was hosting the April 8, 2016 reception, and who spoke with the campus police that day, was unaware of a barring notice when she met with Ms. Doe in her office on April 11, 2016.

50.    Ms. Doe's April 11, 2016 meeting with Dean Campbell was the only time Ms. Doe has been back on GWU campus since the April 8, 2016 confrontation with Mr. Doe.

51.    At no time did Ms. Doe ever knowingly violate a campus barring notice.

52.    The day following their meeting, April 12, 2016, Dean Campbell emailed Ms. Doe telling her that she was "excited you decided to join the Elliott School Community."

8

53.     Ten days later, on April 22, 2016, Ms. Doe filed a Title IX Complaint against Mr. Doe, alleging sexual harassment and sexual abuse, with Carrie Ross, the University's Assistant Director for Sexual Assault Prevention and Response. (hereinafter "Ms. Ross" or the "Title IX office")

54.     In response to Ms. Doe's Title IX Complaint, the University's Title IX office agreed to issue a no contact order between Mr. and Mrs. Doe for the upcoming fall semester.

55.     Ms. Ross told Ms. Doe in an April 22, 2016 email that "she would be happy to administer a 'No Contact Order' as we discussed this morning."   Ms. Ross further continued in her email to Ms. Doe:

> We always put those into effect in both directions, so both of you would be prohibited from having contact with the other. We can do that on or near the day you move here, perhaps, to signal that it has to do with both of you being here in the area.

56.     Plaintiff avers that issuance of mutual no contact orders is the national standard of care in case of dating violence, and it is GWU's practice to issue mutual no contact orders in the case of male perpetrators under like circumstances.

57.     Plaintiff avers that in cases where the allegations are that a male assaulted a female, it is the University's policy and practice to issue mutual no contact orders, but not to terminate the student, as occurred in this case with Ms. Doe.

58.     As discussed more fully *infra*, conduct far more egregious than that alleged to have been committed by Ms. Doe, where the alleged perpetrator is a male student, has been addressed by the University through the use of mutual no contact

orders.

59.     In sum, prior to Ms. Doe's filing of a Title IX Complaint on April 22, 2016, the University took no disciplinary action against her, nor, in the numerous communications between the University officials and Ms. Doe, did the University indicate that any disciplinary action was contemplated.

60.     Ms. Ross, like Dean Campbell at Admissions, never mentioned the existence of a barring notice, either in her April 22, 2016 conversation with Ms. Doe, nor in her detailed follow-up email of the same date.

61.     Prior to Ms. Doe's filing of a Title IX Complaint on April 22, 2016, no one from the University told Ms. Doe that she was barred from campus or served her with a barring notice.

62.     Ms. Doe's April 22, 2016 Title IX Complaint triggered a retaliatory response which would soon lead to her summary expulsion from the University.

63.     After agreeing to the mutual no contact orders, upon information, Ms. Ross contacted RaShall Brackney, the University's new Chief of Police.

64.     Upon information, Ms. Ross revealed information to Chief Brackney which Ms. Doe had provided in confidence, which was critical of the campus police decision to arrest Ms. Doe, while releasing Mr. Doe. Ms. Ross shared with Chief Brackney Ms. Doe's view that the disparate treatment between how the University responded to Mr. Doe and Ms. Doe was unfair.

65.     Upon information, Ms. Ross also told Chief Brackney that the University's Title IX office had decided to issue standard mutual no contact orders.

66.     Upon information, Chief Brackney told Ms. Ross that she, as Chief of Police, had exclusive authority over Ms. Doe's status by virtue of a "barring notice" Brackney claimed was handed to and acknowledged by Ms. Doe on the day she was arrested – effectively mooting any action by the professionals at Title IX.

67.     Upon information, prior to learning of Ms. Doe's Title IX Complaint, Chief Brackney had not told any University official about the existence of the alleged barring notice.

68.     Upon information, it is the campus police's standard practice and policy to promptly inform University administration officials whenever a barring notice is issued. The absence of notification would violate University policy.

69.     On or about April 25, 2016, Chief Brackney and others, acting on behalf of the University, decided to take disciplinary action against Ms. Doe based on gender discrimination, and in retaliation for Ms. Doe filing a Title IX Complaint.

70.     On April 25, 2016, Dean Campbell, the Director of Graduate Admissions at Elliott, out of nowhere, emailed Ms. Doe threatening to "rescind your admission" unless within five (5) days she provide a "a written statement explaining your conduct." This "five day letter" was the only due process the University afforded to Ms. Doe.

71.     Dean Campbell's April 25, 2016 email did not ask Ms. Doe to address the barring issue, or mention anything about a barring notice.

72.     Upon information, Dean Campbell sent the same request for written explanation to Mr. Doe.

73.     The next day, April 26, 2016, Ms. Doe provided a thoughtful and detailed explanation in response to Dean Campbell's April 25, 2016 request for explanation.

74.     Upon information, Mr. Doe responded to his letter from Dean Campbell by once again blaming Ms. Doe for everything, accepting no personal responsibility himself, while maintaining the false narrative he would later retract, and yet Mr. Doe suffered no consequences.

75.     Even after Mr. Doe retracted his allegations under oath – allegations which were the basis of Ms. Doe's expulsion – the university failed to discipline Mr. Doe in any way.

76.     On April 26, 2016, Ms. Ross, the University's Title IX coordinator, also emailed to Ms. Doe as follows:

> Our Chief of Police is Rashall [sic] Brackney. She confirmed to me this morning that there is an order in place banning you from campus and that you wouldn't be allowed to enroll/attend unless it was lifted. In order to appeal this ban and request that it be lifted, you would need to make a request in writing. While she said that at this point the police report from the 8th is final and cannot be amended, you could include all relevant details from the fall til [sic] now, including your perspective about the 8th, in your petition to her. This would be a separate process from your petition/letter to the Elliott School, but I imagine that the documents could be very similar. Please keep me posted about your communications and process regarding the Campus Ban and the Elliott school consideration.

77.     Ms. Ross' April 26, 2016 email was the first time anyone at the University told Ms. Doe that a barring notice existed.

78.     Ms. Doe did not learn of the barring notice allegation until *after* she had filed her response to Dean Campbell's five-day letter.

12

79.    Ms. Doe avers that the process provided to her – an ad hoc appeal to the chief of police – does not satisfy the due process requirements of Title IX, the Human Rights Act, and violates the University's Code of Student Conduct, Student Handbook, and published Student Grievance Procedures.

80.    Ms. Doe avers that the summary barring notice procedure the University afforded her is not a substitute for the due process required by Title IX.

81.    A week after receiving Ms. Doe's April 26, 2016 statement, on May 2, 2016, Dean Campbell emailed to Ms. Doe instructing her to (1) establish an official GW email account[1] (2) contact and schedule a meeting with her faculty advisor, (3) submit a personalized "Plan of Study" online, and (4) complete her first course on-line through GW's on-line app called "Blackboard." Dean Campbell concluded with the salutation: "Again, welcome. We look forward to seeing you soon!" (exclamation in original).

82.    Nine days later, on May 5th, Dean Campbell emailed Ms. Doe's indicating that she too "recently became aware that GWPD issued a bar notice that prohibits your entry on university owned or operated property for 5 years" and asking Ms. Doe to contact GWPD to see about having the bar lifted.

83.    Ms. Doe denies being served with a barring notice from the University and had no knowledge of a bar until later hearing about it from Ms. Ross at Title IX.

84.    The University uses a standard, pre-printed barring notice form, which contains a signature line for an acknowledgement of receipt – which Ms. Doe denies having ever been served with or signed.

---

[1] Dean Campbell and Ms. Doe had been communicating through Ms. Doe's personal email account.

13

85.     In a May 17, 2016 email, Police Chief Brackney told Dean Campbell and Ms. Ross that "Ms. Doe was handed a bar notice on the day of her arrest and acknowledged she was given the notice."

86.     However, when the actual barring notice was never served.

87.     Where the recipient' acknowledgment signature would ordinarily appear on the barring notice, someone wrote in capital letters "HANDCUFFED."

88.     As the custodian of Ms. Doe's campus police file, Chief Brackney knew or should have known that the barring notice read "HANDCUFFED" when she claimed in her May 17 email that Ms. Doe was handed the barring notice and acknowledged receipt.

89.     Chief Brackney's assertion that "Ms. Doe, was handed a bar notice on the day of her arrest and acknowledged she was given the notice" is false.

90.     Chief Brackney, as a custodian of police records, knew or should have known that her statement that "Ms. Doe was handed a bar notice on the day of her arrest and acknowledged she was given the notice" was false.

91.     Ms. Doe was told by both Dean Campbell at admissions, and Ms. Ross at Title IX, that she needed to appeal to Chief Brackney to seek to have the barring notice lifted.

92.     At the time Campbell and Ross directed Ms. Doe to appeal to the Police Chief to have the barring notice lifted, they both knew that Ms. Doe had been on campus on April 11, 2026 to meet with Dean Campbell, so that if a barring notice had been served, Ms. Doe had already violated it.

14

93.     Neither Dean Campbell nor Ms. Ross informed Ms. Doe of her rights under Title IX, or University Student Grievance Procedures and/or the Code of Student Conduct.

94.     Instead, the University affirmatively told Ms. Doe that she is *not* entitled to the substantive and procedural rights conferred by Title IX, or University Student Grievance Procedures and/or the Code of Student Conduct because fall semester classes had not officially begun.

95.     Upon information and belief, the University has adjudicated the cases of dozens of male students charged with similar violations through its University Grievance Procedures – which include the due process denied Ms. Doe – when the conduct subject to discipline occurred in the time between admissions and the beginning of classes. The basis of this belief is, inter alia, a published article in the GWU student newspaper describing the University's use of its grievance procedures for male students accused of misconduct in the time period between admissions and the official start of classes.

96.     At all times relevant, the University published a formal, written "Threats and Violence Policy" which entitled enrolled students, including plaintiff, to substantive and procedural due process rights and include the following:

> The university has established specific procedures to address incidents involving sexual assault, which will also be used to address incidents involving domestic violence, dating violence and stalking. These procedures involve consultation, administrative review and formal hearing, and will be conducted in a prompt, fair and impartial manner by individuals who are trained for these tasks and understand the difficult and sensitive issues involved.
>
> (GW Threats and Violence Policy at 2)

15

97.     GWU's "Threats and Violence Policy" is required by the University's Title IX mandate.

98.     Ms. Doe was denied the benefits of the University's "Threats and Violence Policy," including consultation, administrative review, and a formal hearing before an impartial fact finder trained in the difficult and sensitive issues involved.

99.     Instead, Ms. Doe was instructed that her only recourse was an ad hoc request for reconsideration to the same police department which had initially arrested her, and sought to have her criminally prosecuted.

100.    The ad hoc review process offered to Ms. Doe was unfair, and ultimately futile, because the Police Chief had already decided key factual issues against Ms. Doe, including that she was guilty of assault, and had violated the campus barring notice.

101.    The University denied Ms. Doe a hearing at every stage of the disciplinary process. Ms. Doe has never had a hearing, in any forum, on the allegations which lead to her dismissal.

102.    Following the instructions of Ms. Ross, on June, 24, 2016, Ms. Doe wrote to Chief Brackney asking to rescind the barring notice.

103.    On July 7, 2016, Chief Brackney, via email, denied Ms. Doe's request to have her bar notice rescinded.

104.    The University summarily barred Ms. Doe from entering not only the buildings and facilities of GWU, but the entire neighborhood, including all of the public streets and sidewalks appurtenant to the school campus, bus stops, a major Metro

station, shopping mall, bike lanes, and portions of popular thoroughfares, including Pennsylvania Avenue.

105.    Chief Brackney allowed that she would be amenable to reconsider if Ms. Doe submitted another request in the spring of 2017, but with no guarantees such application would be considered.

106.    Chief Brackney did not provide any reasons for her denial.

107.    While Chief Brackney said in a June 26, 2016 email, that she would "review all relevant documents," the evidence Chief Brackney relied upon was never disclosed.

108.    Chief Brackney is not a neutral and detached fact-finder, because of her role as the Chief of the Police agency which arrested and prosecuted Ms. Doe, and because she had already reached conclusions about key issues of material fact.

109.    On the same day, Ms. Doe asked Chief Brackney via email to reconsider, which the Chief denied five days later on July 12, 2016, again via email.

110.    On July 22, 2016, Dean Campbell emailed Ms. Doe informing her that her admission to GW had been rescinded. The University claimed as reasons (1) the violation of the barring notice and (2) electronic access to the University internet portal:

In assessing your admission status, consideration was given to the first incident that put your admission in jeopardy and your actions following that incident. It was significantly concerning that you violated the barring notice issued by the Chief of Police after it was issued, and that you continued to participate in program activities electronically despite clear communication that your admission status was being reconsidered.

The Admissions Committee has decided to rescind your admission to the George Washington University Elliott School of International Affairs. You

`

.

> will be administratively withdrawn from your classes, and your $500
> deposit will be refunded to you. No appeals of this decision will be
> considered.

(July 22, 2016 email from Dean Campbell to Doe)

111. Prior to terminating Ms. Doe from its program, the University never notified Ms. Doe that the University was considering discipline based on the barring notice violation.

112. Prior to terminating Ms. Doe from its program, the University never notified Ms. Doe that the University was considering discipline based use of the University's internet portal or Blackboard app.

113. The notice provided Ms. Doe does not meet the minimum standards of due process and violates Title IX.

114. Plaintiff avers that the reasons given by Dean Campbell in her July 22, 2016 email are pretexts for gender discrimination and retaliation. Specifically, plaintiff avers that no barring notice was issued on April 8, 2016. If there was a barring notice, it was never served on plaintiff. Even if a barring notice existed, Ms. Doe's single visit with Dean Campbell on April 11 hardly justifies summary termination from school. The only time Ms. Doe has been on GW campus since April 8, 2016 was for her April 11, 2016 meeting with Dean Campbell, Elliott's Dean of Admissions.

115. Regarding the access to University program activities electronically, that too is a transparent pretext for gender discrimination and retaliation. Ms. Doe was never told to stop participating in Elliott program activities on-line during the review

process. Indeed, the University invited and encouraged Ms. Doe in a series of emails to continue to access the University electronically throughout the relevant time period.

116.    The University's articulated reasons for imposing discipline contain such weaknesses, implausibilities, inconsistencies, incoherencies and contradictions in the proffered reasons that any reasonable fact finder would find them unworthy of credence and/or that the defendants did not act for the asserted non-discriminatory reasons.

117.    The failure to provide notice of the allegations and a hearing at any stage, without more, casts articulable doubt on the accuracy of the outcome of the disciplinary process.

118.    Ms. Doe was never given the opportunity, at any stage in the proceedings, to establish the material facts to support her contentions that she (1) did not assault Mr. Doe (2) did not violate the barring notice, or (3) accessed the University web server without authorization – the facts which the University relied upon to terminate her from the program and bar her from the GWU neighborhood.

119.    Nor was Ms. Doe given the opportunity to present mitigating evidence, including that the existence of the bar notice was unclear, that she was only on campus one time to meet Dean Campbell, that she has never returned to campus thereafter, or had any contact with Mr. Doe, lacks a prior disciplinary record, and other evidence relevant to the issue of sanctions, including Mr. Doe's retraction of his allegation of assault.

120.    The rescission of admission and barring of Ms. Doe denied her due

process, treating her differently than the male involved, in violation of Title IX, §1981, D.C.'s Human Rights Act, and common law and is retaliatory.

121.    The summary rescission of admission and barring of Ms. Doe differs from the treatment of other male students in other cases who had committed more serious offenses, in violation of Title IX, §1981, D.C.'s Human Rights Act, and common law and is retaliatory.

122.    The timing of the University's initiation of discipline, only after Ms. Doe filed her Title IX complaint, and the implausibility of the articulated reasons for expulsion evidences gender discrimination and constitutes retaliation in violation of Title IX, §1981, D.C.'s Human Rights Act, and common law.

123.    As articulated in the Counts below, Plaintiff's Title IX claims arise from the disciplinary proceeding against her under the "erroneous outcome" standard, "selective enforcement" standard, "retaliation" standard, and "archaic assumptions" standard.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION Violation of Title IX of the Education Amendments of 1972 (Erroneous Outcome)**

124.    Plaintiff repeats and realleges each allegation hereinabove as if fully set forth again.

125. Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

126. George Washington University receives federal funding and accordingly is subject to the provisions of Title IX.

127. The Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student...complaints alleging any action which would be prohibited by Title IX or regulations thereunder." 34 C.F.R. § 106.8(b) (Dept. of Education); 28 C.F.R. § 54.135(b) (Dept. of Justice).

128. In January, 2001, the United States Department of Education, Office for Civil Rights, published a set of compliance standards for Title IX educational institutions to apply in including standards for "Prompt and Equitable Grievance Procedures" and "Due Process Rights of the Accused." 66 F.R. 5512 (referred to below as "OCR Standards").

129. The OCR Standards require schools not only to "ensure the Title IX rights of the complainant," but also to "accord due process to both parties involved." (emphasis added)

130. The OCR due process standards require schools to provide, at a minimum,

"notice of the allegations and an impartial investigation of complaints, including the opportunity to present witnesses and other evidence."

107.    The OCR Standards require Title IX schools to ensure that all employees involved in the conduct of the procedures are specially trained in Title IX.

131.    The University failed to provide the minimum OCR standards to Ms. Doe before taking disciplinary actions against her which resulted in her summary termination from Elliott and caused lasting and permanent harm.

132.    In imposing discipline on Ms. Doe, the University failed to comply with Title IX's due process standards generally, and the OCR Standards in multiple ways, including failure to provide notice of the charges, and an opportunity to be heard before a neutral and detached fact finder using pre-established rules of procedure.

133.    The procedure the University used – an ad hoc letter to the Police Chief to "include all relevant details ...including your perspective" – is so devoid of due process as to create a substantial likelihood of an erroneous outcome.

134.    Had a hearing been conducted, as required by Title IX, the allegations relied upon by the University to punish Ms. Doe would not have been substantiated.

135.    Had a hearing been conducted, as required by Title IX, John Doe would have testified, in accord with his sworn declaration, that Jane Doe (1) did not intentionally spill coffee on him, (2) did not intend to use force or violence against him in any way, (3) did not intend to commit simple assault and (4) that Ms. Doe was never a threat to his safety.

136.    Had a hearing been conducted, as required by Title IX, undisputed

evidence would have established that Ms. Doe did not violate the barring notice, or the University's computer access policies. Specifically, the testimony of Ms. Doe, Dean Campbell and Ms. Ross would establish that Ms. Doe was unaware of the barring notice on April 11, 2016, the only day she has been on campus after the April 8th incident, and that the University never told Ms. Doe to cease accessing the internet portal.

137.   Had a hearing been conducted, as required by Title IX, Chief Brackney's claim that Ms. Doe had been "handed" and "acknowledged" the receipt of the barring notice would have been proven false.

138.   Had a hearing been conducted, as required by Title IX, the fact finder would have been a trained Title IX professional, not the same police department who arrested Ms. Doe and concocted a specious barring notice.

139.   In reaching its decision and imposing sanctions on Ms. Doe, the University deprived her of the due process and equal protection rights required by Title IX and the OCR Standards by, among other things:

a.   Failing to provide notice;
b.   Failure to provide a hearing;
c.   Failure to take testimony;
d.   Relegating the Title IX determination to the campus police department;
e.   Finding Jane Doe violated a barring notice, against the evidence;
f.   Finding Jane Doe assaulted John Doe, against the evidence, and despite Mr. Doe's affidavit of retraction;
g.   Imposing sanctions on Jane Doe while excusing the similarly situated male participant;
h.   Retaliating against Jane Doe for filing a Title IX complaint;
i.   Failing to provide appeal rights;
j.   Imposing sanctions that were unwarranted and disproportionate

to the severity of the charges levied against her, and without any
consideration of mitigating circumstances;

i.      Failing to follow its own internal guidelines and procedures.

140.    GWU's violations were knowing, as the University had notice of the flaws

in its sexual misconduct program from multiple sources, including prior law suits and

upon information and belief, its own internal reviews.

141.    GWU's violations were knowing, as the University at all relevant times

had a published "Threats and Violence Policy" which contained important substantive

and procedural rights, but failed to follow its own policy.

142.    GWU's flawed program and mishandling of Jane Doe's case are

symptomatic of a broader culture of inherent, systematic and intentional gender bias in

favor of male students and against female students accused of misconduct.

143.    GWU knew that the due process they were providing to Jane Doe did not

meet Title IX mandates or minimum due process requirements, but University official

tasked with implementing Title IX were unwilling to cross the powerful Campus Police

Chief.

144.    In order to conceal their known Title IX violations, and justify their illegal

imposition of discipline, made on the basis of gender discrimination, the University

concocted a litany of pretextual excuses, including, but not limited to:

   a.   Falsely telling plaintiff that Title IX does not apply to her because
        the classes had not officially started;
   b.   Falsely telling plaintiff that she had violated a barring that was
        served upon her, when University records show the bar notice
        was never served;

c.   Falsely telling plaintiff that she violated University computer
     access policies;
d.   Falsely telling plaintiff that her only remedy for Title IX violations
     was an appeal to the campus police;
e.   Falsely telling Ms. Doe no appeals are possible.

145.   The process afforded to Ms. Doe stands in contrast to the process

provided to Mr. Doe, an admitted male student, whose circumstances were

substantially similar, and conduct was more culpable.  Nevertheless, Mr. Doe was not:

a.   Arrested;
b.   Hauled off to jail;
c.   Barred from the University;
d.   His case was not sent to the Chief of Police;
e.   He was not compelled to seek permission from the Chief of Police
     to return to campus;
f.   His version of events was credited, even though he later recanted
     his allegation in a sworn declaration;
g.   He was allowed to return to the Elliott school reception on April 8,
     2016, and subsequently began classes in the fall of 2016 without
     any sanctions being imposed;
h.   Although his original, false allegations led to the expulsion of Ms.
     Doe, he received no sanctions for his monstrous fabrications.

146.   The specific instances listed above of disparate treatment of a similarly

situated individual outside plaintiff's protected class are highly probative on the issue of

discrimination based on gender bias.

147.   In the face of damning contradictory evidence, and lack of fundamental

due process, GWU's finding that Jane Doe was responsible for the misconduct alleged is

fatally flawed.

148.   The erroneous outcome in Ms. Doe's case reflects a pattern of decision

making and procedural missteps by the University throughout the entire disciplinary

process leading to an erroneous outcome.

149.    The University's findings that Jane Doe assaulted John Doe, violated a barring notice, and improperly accessed the University website are erroneous.

150.    GWU's discipline was the result of disparate treatment of Jane Doe on the basis of her gender, depriving Jane Doe, as a female student, of educational opportunities at GWU on the basis of her sex.

151.    GWU failed to engage in impartial fact finding, failed to fairly weigh evidence presented by John Doe vs. Jane Doe, and harbored an overall institutional gender bias against Jane Doe, as the female student accused of misconduct, all of which led to the erroneous decision.

152.    GWU's violations of its obligations under Title IX proximately caused Jane Doe to sustain irreparable damage, including, without limitation, emotional distress, economic injuries, employment prospects, reputational damages, loss of scholarship, and the loss of educational opportunities and other direct and consequential damages.

153.    Jane Doe is entitled to compensatory damages for the harm she suffered as a result of GWU's violation of its Title IX obligations. Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, and expenses.

## SECOND CAUSE OF ACTION Violation of Title IX of the Education Amendments of 1972 (Selective Outcome)

154.    Plaintiff repeats and realleges each allegation hereinabove as if fully set forth again.

155.    Both the decision to initiate disciplinary proceedings against Ms. Doe, and the severity of the penalty imposed, were motivated by gender discrimination.

156.    Ms. Doe, a female, was in circumstances sufficiently similar to those of Mr. Doe, a male student, yet he was treated more favorably by the University.

157.    Specifically, unlike Ms. Doe, Mr. Doe was not arrested, barred from campus, made to plead his case before the Police Chief, or sanctioned in any way.

158.    Mr. Doe is a comparator of the opposite sex who was treated more favorably by the University for engaging in comparable conduct.

159.    Furthermore, at each stage of the dispute, Mr. Doe's version of events was fully credited by the University, even after he retracted all of his allegations under oath.

160.    In contrast, Ms. Doe was disbelieved at each stage, despite substantial evidence supporting her contentions that (1) she was the victim of abuse, (2) she never assaulted Mr. Doe, (3) she was unaware of the campus barring notice, or any restrictions on accessing her GW on-line account while her matter was being reviewed.

161.    The University's disparate treatment of the Does follows a pattern in which males accused of assault receive no sanctions at all, or are afforded sanctions far less severe than the discipline imposed on Ms. Doe.

162.    Upon information, in the case of V.T., a male GW student allegedly stalked, sexually harassed and finally physically assaulted a female GW student on campus, after she tried to end a romantic relationship. V.T.'s case was referred to the

Office of Student Rights & Responsibilities ("OSRR"), which provided due process to both parties in accord with published University Standards, including notice and hearing.

163.    The discipline imposed by GWU on V.T. was the imposition of mutual "no contact" orders, allowing both students to remain on campus and continue with their studies.[2]  V.T. was never barred from campus.

164.    Upon information, in the case of another student, "John Doe 2011," the University allowed a male student who had been found by University judicial process to have sexually assaulted a female student to remain on campus, again under the "no contact" program.

165.    In the cases of V.T. and John Doe 2011, the conduct of the male perpetrator – in one case alleged, and in the other actually proven – was more egregious than then allegations against Ms. Doe here. Yet, the University never barred these male students, allowing them to remain on campus and finish their studies under the minimally restrictive "no contact" provision.

166.    GWU's handing of the cases of V.T., John Doe 2011 (and John Doe in this case) fits within a pattern of gender bias in favor of male students in cases of alleged dating-related violence.

167.    These male students were never barred from campus, and were given their full panoply of due process rights. Ms. Doe was blamed, shamed and summarily

---

[2] Upon information on January 25, 2012 the GWU Office of Student Rights & Responsibilities ("OSRR") issued no contact orders to both V.T. and the complainant in his case.

expelled from the community using a barring notice – a process typically reserved for criminals, trespassers and thieves.

168.    Indeed, the severity of the penalty imposed – summary barring from the University – stands in contrast to that of the three male perpetrators discussed above, whose punished ranged from zero to the minimally inconvenient "no contact" orders. The harshness of punishment imposed against Ms. Doe, even if the allegation had been proven, is reflective of selective enforcement, violative of Title IX.

169.    Dean Campbell's July 22, 2016 email termination letter cites the barring notice violation and electronic access as "significantly concerning" acts justifying the punishment:

> It was significantly concerning that you violated the barring notice issued by the Chief of Police after it was issued, and that you continued to participate in program activities electronically despite clear communication that your admission status was being reconsidered.

(July 22, 2016 email from Campbell to Doe)

170.    Even if true, these acts can hardly justify the ultimate sanction of summary termination from the University and barring from the GWU neighborhood, unless selective outcome was the motivating factor. Ms. Doe returned to campus only one time after April 8th, 2016, and that was for an April 11th meeting with Dean Campbell. Her continued use of the University web portal in an appropriate manner is not the kind of conduct which would result in sanctions, but for discrimination.

171.    The University contacted Ms. Doe repeatedly after April 8, 2016 inviting her to access the on-line portal and continue with the normal admission process. At no time did the University ever tell Ms. Doe to cease electronic access.

172.    GWU justifications for its conduct towards Ms. Doe are so feeble as to be themselves substantial evidence of bad faith sufficient for a reasonable jury to find selective enforcement and discriminatory intent.

173.    Therefore, both the decision to initiate disciplinary proceeding against Jane Doe, and the severity of the penalty imposed, were motivated by gender discrimination, depriving Jane Doe, as a female student, of educational opportunities at GWU on the basis of her sex.

174.    GWU's violations of its obligations under Title IX proximately caused Jane Doe to sustain irreparable damage, including, without limitation, emotional distress, economic injuries, employment prospects, reputational damages, her scholarship, and the loss of educational opportunities and other direct and consequential damages.

175.    Jane Doe is entitled to compensatory damages for the harm she suffered as a result of GWU's violation of its Title IX obligations.

176.    As a result of the foregoing, Jane Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## THIRD CAUSE OF ACTION Violation of Title IX of the Education Amendments of 1972 (Retaliation)

177.    Jane Doe repeats and realleges each and every allegation hereinabove as

if fully set forth herein.

178.    Between April 8, 2016, the day of the confrontation between Mr. and Ms. Doe, and April 22, 2016, the day Ms. Doe filed her Title IX Complaint, the University took no disciplinary action against Ms. Doe, either when Ms. Doe met with Dean Campbell, or in the numerous email communications between the University and Ms. Doe. Nor did the University indicate that any disciplinary action was contemplated, until after Ms. Doe filed her Title IX complaint.

179.    After Ms. Doe filed a Title IX Complaint, objecting to the disparate treatment she received as compared to Mr. Doe, the University initiated an unfair and illegal disciplinary process which ultimately resulted in her summary termination from the University.

180.    The disciplinary actions taken by GWU against Ms. Doe are in retaliation for Ms. Doe's filing a Title IX complaint and objecting to the original disparate treatment she received as compared to Mr. Doe.

181.    Later, the University, in a second form of retaliation, referred Ms. Doe's matter to the Chief of Police for summary adjudication under the barring notice standard, and finally retaliated by cancelling her admissions entirely when she voiced opposition to the initial barring decision.

182.    The University breached its obligations under Title IX proximately causing Jane Doe to sustain irreparable damage, including, without limitation, emotional distress, economic injuries, employment prospects, reputational damages, her scholarship, and the loss of educational opportunities and other direct and

consequential damages.

183.    Jane Doe is entitled to compensatory damages for the harm she suffered as a result of GWU's violation of its Title IX obligations.

184.    As a result of the foregoing, Jane Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## FOURTH CAUSE OF ACTION Violation of Title IX of the Education Amendments of 1972 (Archaic Assumptions)

185.    Jane Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

186.    John Doe's original narrative to the University police was that Jane Doe was a "woman scorned" – a traditional sexual stereotype which holds a woman rejected in love will stop at nothing to exact her revenge. "Hell hath no fury like a woman scorned," is original formulation of this sexual stereotype found in *The Morning Bride,* a 1697 play by William Congreve. Thereafter, the "scorned woman" stereotype became a false, archaic assumption, used to blame and shame women. Plaintiff will present expert testimony that statistically scorned men are vastly more apt to resort to violence than scorned women, the inverse of the traditional stereotype.

187.    John Doe's false scorned woman narrative was immediately accepted by the University without question. By any objective standard, Jane Doe faired the worse in her April 8th confrontation with John Doe. Photos depict Jane Doe with visible physical injuries and distraught. While John Doe's shirt appears stained, he is otherwise

unharmed and smiling. The University returned him to the Elliott breakfast reception, while Jane Doe was hauled off to jail and, according to the University, summarily barred from the University for five years, using a barring notice procedure typically reserved for trespassers, thieves and criminals.

188. The University reached its conclusions as to comparative dangerousness without any sort of investigation as to the truth of John Doe's allegations, accepting the classic "scorned woman" stereotyping without question.

189. The disparate treatment the University provided to Jane Doe and John Doe was motivated by sexual stereotyping based on archaic assumptions. Jane Doe was considered a dangerous predator, excluded from the University Community, while John Doe, with equal or greater culpability, was warmly welcomed back into the community. Fairness would have required the University to consider another old adage, "it takes two to Tango."

190. At each stage of the dispute between Mr. and Ms. Doe, the University credited Mr. Doe's version, even though he would later retract his allegations as false.

191. In a similar fashion, the University credited the report of the male officers that Ms. Doe was served with the barring notice, as against Ms. Doe's claim that she never received it.

192. Archaic assumptions about dangerousness, even if firmly held by the University, constitute intentional gender discrimination because they are based upon archaic beliefs and stereotypes about gender.

33

193.    The archaic scorned woman stereotype was also a motivating factor behind the incredibly harsh sanctions imposed. Because the stereotypical scorned woman will stop at nothing to exact her revenge, it follows that no reasonable measures, such as mutual no contact orders, will be effective.

194.    George Washington University has a long history and practice of blaming and shaming women in cases of dating-related violence.

195.    On August 24, 2014, Stephen Joel Trachtenberg, President emeritus of the University, President of GWU's Trachtenberg School of Public Policy and Public Administration, who was President of the University for 19 years, and the author of the autobiography "Big Man on Campus," blamed women for their own sexual assaults because they "drink in excess." President Trachtenberg told NPR Radio, on a radio show about campus sexual assaults, that "one of the groups that have to be trained not to drink in excess are women."[3]

196.    The notions that female George Washington University students need to be "trained," and that excess consumption of alcohol by women is the cause of campus rape are archaic, backward and abhorrent notions which have no place in higher education or society today.

197.    GWU's handing of Jane Doe's case fits within a pattern of gender bias tolerated and cultivated at the defendant University and characterized by blaming women for dating violence on campus, and shaming women by imposing discipline

---

[3] http://thedianerehmshow.org/shows/2014-08-26/role-fraternities-and-sororities-today. Retrieved November 3, 2016.

based on gender, while taking at face value the archaic sexual stereotypes expressed by men.

198.    Jane Doe was disciplined on the basis of an archaic assumption when the University (1) found her responsible for physical harm to John Doe (2) applied disparate treatment to the Does (3) used an inappropriate and illegal summary procedure to banish Ms. Doe on the basis of her gender, depriving Jane Doe, as a female student, of educational opportunities at GWU on the basis of her sex.

199.    GWU treats female students accused of sexual misconduct as "guilty until proven innocent" based on invidious gender stereotypes.

200.    GWU's violations of its obligations under Title IX proximately caused Jane Doe to sustain irreparable damage, including, without limitation, emotional distress, economic injuries, loss of employment prospects, reputational damages, her scholarship, and the loss of educational opportunities and other direct and consequential damages.

201.    Jane Doe is entitled to compensatory damages for the harm she suffered as a result of GWU's violation of its Title IX obligations.

202.    As a result of the foregoing, Jane Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, and costs.


**FIFTH CAUSE OF ACTION: Violation of the District of Columbia Human Rights Act**

203.    Jane Doe repeats and realleges each allegation hereinabove as if fully set

forth herein.

204.    The District of Columbia Human Rights Act, § 2-1402.41, prohibits the

educational institutions:

> To deny, restrict, or to abridge or condition the use of, or access to, any
> of its facilities, services, programs, or benefits of any program or activity
> to any person otherwise qualified, wholly or partially, for a discriminatory
> reason, based upon sex.

205.    Section § 2-1403.16 to the Act provides for a private cause of action.

206.    The allegations of discrimination which support plaintiff's federal Title IX

claim, incorporated herein, also serve to state a claim under § 2-1402.41 of the D.C.

Human Rights Act.

207.    GWU's violations of its obligations under the D.C. Human Rights Act

proximately caused Jane Doe to sustain irreparable damage, including, without

limitation, emotional distress, economic injuries, employment prospects, reputational

damages, her scholarship, and the loss of educational opportunities and other direct

and consequential damages.

208.    Jane Doe is entitled to compensatory damages for the harm she suffered

as a result of GWU's violation of the D.C. Human Rights Act.

209.    As a result of the foregoing, Jane Doe is entitled to damages in an amount

to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, and

costs.

**SIXTH CAUSE OF ACTION:  Breach of Contract**

210.    Jane Doe repeats and realleges each allegation hereinabove as if fully set forth herein.

211.    GWU made an offer of admission to Ms. Doe to begin classes in the fall 2016 semester. When Ms. Doe accepted that offer, and paid a non-refundable deposit by check, which GWU cashed, a contract was established between Ms. Doe and GWU.

212.    The contract between Ms. Doe and GWU included terms and conditions regulating the duties of the respective parties published in the University Bulletin, and other documents including GWU's Code of Student Conduct, Student Grievance Procedures, Sexual Harassment and Sexual Violence Policy and Procedures, and Threats and Acts of Violence Policy (hereinafter collectively "University Standards") and these University Standards represent a contractual and legal commitment between Jane Doe and the University.

213.    The University Standards do not permit the Chief of University Police to alter or amend a student's admission or enrollment status.

214.    Likewise, under University Standards there is no mechanism through which the University can "rescind an offer of admission" after it is accepted. The only processes which can result in punitive measures severing relationships with the University based on on-campus behavior belong to the Student Rights and Responsibilities Office or the Title IX office.

215.    The University Standards established a specific set of procedures to address incidents of date-related violence, but GWU failed to follow them in this case.

216.     GWU failed to take Ms. Doe's allegations of violence by Mr. Doe seriously, and failed to afford Ms. Doe the due process and equal protection Standards provide her with regard to Mr. Doe's claims against her.

217.     The Standards provide for Title IX consultation, administrative review, and if the matter cannot be resolved through consultation, a "formal hearing" in accord with Student Code of Conduct and Student Handbook. The University Standards require that when a student is charged with violations of the Code, he or she is entitled to, inter alia, (i) be assumed not responsible of any alleged violations unless she/he is so found through the appropriate student conduct hearing; (ii) have a reasonable length of time to prepare a response to any charges; (iii) be informed of the evidence upon which a charge is based and accorded an opportunity to offer a relevant response; (iv) be given every opportunity to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer; and (v) request that a hearing officer or member of a hearing body be disqualified on the grounds of personal bias. (vi) question witnesses (vii) an appeal.

218.     None of the due process guarantees found in GWU's published University Standards were provided to Ms. Doe. GWU's failure to provide due process to Jane Doe breached its contract with Ms. Doe, its own policies, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

219.     Based on the aforementioned facts and circumstances, GWU breached and violated a covenant of good faith and fair dealing implied in the contract between the parties.

220.    GWU's discrimination of Jane Doe on the basis of her female gender breached its own published policies, guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

221.    Failing to investigate or charge John Doe with violation of the Code for misrepresentation notwithstanding evidence that John Doe retracted his account.

222.    GWU's failure to investigate or charge John Doe with a violation of the Code for misrepresentation breached its own policies, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

223.    GWU has deprived Jane Doe, of her contractual rights to due process and equal protection through the improper administration of the student conduct board hearing process in violation of GWU's guidelines and regulations.

224.    GWU failed to protect Jane Doe by standards of justice and fairness during the disciplinary process.

225.    GWU wrongfully banned Jane Doe from campus upon notice of John Doe's allegations, without performing a minimum level of investigation in violation of the GWU's commitment to separate a student from GWU following University Standards.

226.    GWU's incomplete and arbitrary actions breached the Student Rights and Responsibilities, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

227.    Therefore, GWU breached its contract with Jane Doe which proximately caused Jane Doe to sustain irreparable damage, including, without limitation, emotional

distress, economic injuries, employment prospects, reputational damages, her scholarship, and the loss of educational opportunities and other direct and consequential damages.

228. Jane Doe is entitled to compensatory damages for the harm she suffered as a result of GWU's violation of its Title IX obligations.

229. As a result of the foregoing, Jane Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### SEVENTH CAUSE OF ACTION: §1983

230. Jane Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

231. 42 U.S.C. § 1983 prohibits the deprivation under color of law of the rights secured under the United States Constitution, including the Fourth Amendment right to be free from unreasonable seizures, and Fifth and Fourteenth Amendments guarantees due process and equal protection of the law, and the freedom of movement and travel upon public roads and in public places.

232. At all times relevant, the campus police officers who detained and arrest plaintiff were acting under color of law.

233. At all times relevant, University Police Chief RaShall Brackney was acting under color of law.

234.    In arresting and barring Ms. Doe, the defendants, acting under color of law, deprived her of her Fourth, Fifth and Fourteenth Amendment rights.

235.    The seizure, detention and arrest of Ms. Doe, made under color of law by University Police, was illegal and lacking in probable cause in violation of §1983.

236.    Following arrest, campus Police Chief Brackney issued a barring notice prohibiting Ms. Doe from entering not only the building and property of George Washington University, but all of the roads, sidewalks and public property appurtenant to the University, which constitutes a significant portion of the area of the city.

237.    The area from which Ms. Doe is purportedly barred contains important public facilities, such as public bus routes, public roadways, and parks, along with private businesses, such as shops, restaurants, stores, medical facilities.

238.    The area from which Ms. Doe is purportedly barred is a major conduit to other parts of the city.

239.    The barring was done at the direction of Police Chief Brackney without any due process, in violation of Title IX and state law, and was retaliatory.

240.    The barring of Ms. Doe violated her right to travel upon the public streets, sidewalks and rails of the District of Columbia absent a constitutionally sound reason for limiting her access in violation of §1983.

241.    As a direct and foreseeable consequence of these depravations, Jane Doe sustained tremendous damages, including, without limitation, emotional distress, economic injuries, including loss of scholarship, and other direct and consequential damages.

242. As a result of the foregoing, Jane Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**EIGHTH CAUSE OF ACTION: Negligence**

243. GWU owed duties of care to Jane Doe. Such duties included, without limitation, a duty of reasonable care in the conduct and investigation of the allegations of harassment and sexual assault against her.

244. GWU breached its duty of care owed to Jane Doe by negligently failing to conduct a reasonable investigation, negligently failing to follow its own rules and procedures, in violation of Title IX, common law, and the national standard of care for investigation and resolution of allegations of student disciplinary allegations.

245. As a direct and foreseeable consequence of this negligence, Jane Doe sustained damages, including, without limitation, emotional distress, economic injuries, including loss of scholarship, and other direct and consequential damages.

246. As a result of the foregoing, Jane Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**NINTH CAUSE OF ACTION: Declaratory Judgment**

247. Jane Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

248. GWU has committed numerous violations of the Parties' contracts and of

federal and state law.

249.   Jane Doe's education and future career have been severely damaged. Without appropriate redress, the unfair outcome of the barring notice and expulsion will continue to cause irreversible damages to Jane Doe's educational career and future employment prospects, with no end.

250.   As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of Jane Doe's formal student record at GWU.

251.   Ms. Doe is barred for five years and subject to arrest from a sizable portion of the city on pain of criminal prosecution.

252.   By reason of the foregoing, Jane Doe requests, pursuant to 28 U.S.C. § 2201, a declaration that (i) GWU's sexual misconduct investigation of Jane Doe violated his contractual rights and her due process and equal protection rights, (ii) GWU's findings of misconduct are illegal, null and void, (iii) GWU's current rules, regulations and guidelines, as applied to Ms. Doe, are illegal in violation of Title IX (iv) that barring notice is invalid and void.

### TENTH CAUSE OF ACTION: Injunctive Relief

253.   Jane Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

254.   By virtue of GWU's violation of its legal, contractual, due process and equal protection duties, Jane Doe has suffered irreparable harm for which monetary

damages are an inadequate remedy.

255.    To address that harm, Jane Doe is entitled to injunctive relief from this Honorable Court ordering GWU to (i) reverse the outcome and findings made by the University in Jane Doe's academic records; (ii) expunge all negative references contained in Jane Doe's disciplinary record; (iii) remove all references of Jane Doe's arrest, booking and police/criminal record (iv) permanently destroy any record of Jane Doe's disciplinary record relating to this matter, (v) set aside and invalidate any barring notice, and (vi) and order that she be reinstated into the Elliott program at GWU.

**PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, Jane Doe demands the following relief from defendants:

- An award of compensatory damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional distress, economic injuries, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

- A judicial declaration that: (i) the outcome and findings made by defendants were erroneous and illegal; (ii) the proffered reasons for rescission of admission given Jane Doe are invalid and pretextual; (iii) Jane Doe's disciplinary record is clear and free of misconduct; (iv) the University's rules,

44

regulations and guidelines are illegal as applied to her and (v) that the barring notice is illegal and void;

- The issuance of an injunction ordering the University to (i) reverse the outcome and findings of the University (ii) restore Jane Doe's good standing at the University; (iii) expunge any negative references from Jane Doe's disciplinary record; (iv) remove the record of Jane Doe's deferred expulsion from her education file and (v) permanently destroy any record of Jane Doe's University discipline;

- Remove Jane Doe's name and any references from all police databases and expungement of her police and criminal records;

- Permit the plaintiff to travel freely in all areas from which she was barred by defendants;

- Invalidate and expunge any barring notices;

- An award of the costs and expenses of suit;

- Attorney's fees; and

- Such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Jane Doe herein demands a trial by jury of all triable issues in the present matter.

/S/ PAUL ZUKERBERG

Paul H. Zukerberg, DC Bar # 388152
Zukerberg & Halperin, PLLC
1790 Lanier Place N.W.
Washington, D.C.  20009-2118
(202) 232-6400
paul@zukerberg.com

/S/ JONATHAN E. HALPERIN

Jonathan E. Halperin, DC Bar # 435512
Halperin Law Center
5225 Hickory Park Drive
Suite B
Glen Allen, VA  23059
(804) 220-0223
jonathan@halperinlegal.com

EXHIBIT 1

### Declaration of █████████

In the fall of 2015, I was involved in a romantic relationship with█████████. On April 8, 2016, while attending a session for admitted students at the George Washington University Elliott School of International Affairs, the two of us got into a verbal argument. As a result of this argument, █████████was arrested for simple assault.

I do not believe █████████ intended to use force or violence against me in any way. For this reason, when contacted by prosecuting authorities shortly thereafter, I informed them that I had no interest in pursuing criminal charges because I do not believe █████████ poses a threat to my safety and because I do not believe █████████ intended to commit simple assault against me.

I hold no ill will against █████████, and would hope that this unfortunate incident will not affect her future.

I declare under penalty of perjury that the foregoing is true.

Executed on _August 21_, 2016.